**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| HARREY ANTHONY BROWN and<br>KESHA LYNETTE BROWN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 2:21-cv-03801-DCN-MGB |
| UNITED STATES OF AMERICA,<br>BROOKE ARMY MEDICAL CENTER,<br>DR. GEORGE J. KALLINGAL, DR.<br>ALEXANDER ERNEST, and DR.<br>GRACE E. PARK, | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |

This matter is before the court on Magistrate Judge Mary Gordon Baker's report and recommendation ("R&R"), ECF No. 101, that the court deny plaintiffs Harrey Anthony Brown ("Mr. Brown") and Kesha Lynette Brown's ("Mrs. Brown") (together, "plaintiffs") motion for summary judgment, ECF No. 61, and grant in part and deny in part defendants United States of America (the "United States"), Dr. George J. Kallingal ("Dr. Kallingal"), and Grace E. Park's ("Dr. Park") (together, "defendants") motion for summary judgment and motion for certification, ECF No. 75. For the reasons set forth below, the court adopts the R&R in full.

## I.  BACKGROUND

This case arises out of an allegedly failed medical procedure that Mr. Brown received in May 2019. Mr. Brown was diagnosed with prostate cancer in December 2018, and in March 2019, he and his wife attended a comprehensive prostate cancer clinic at the Brooke Army Medical Center ("BAMC") Urology Clinic in Fort Sam

1

Houston, Texas to discuss various treatment options.  Plaintiffs allege that they met with Dr. Kallingal, a urology oncology surgeon at BAMC, who recommended that Mr. Brown undergo a robotic-assisted laparoscopic radical prostatectomy.  Defendants dispute this account and claim that before meeting Dr. Kallingal, plaintiffs met with several other physicians.  For example, defendants claim that on February 4, 2019, plaintiffs met with "Dr. Morales," who purportedly wrote in his visit notes that he had recommended "active surveillance" for Mr. Brown's "very low risk prostate cancer."  ECF No. 75-5, Kallingal Decl. ¶ 11.  Mr. Brown allegedly "still prefer[red] surgery," so Dr. Kallingal met Mr. Brown for the first time on March 27, 2019.  Id. ¶ 11, 13.  At the visit, Mr. Brown elected to undergo the robotic-assisted laparoscopic prostatectomy.

Plaintiffs allege that Dr. Kallingal claimed to possess "extensive experience and skill with performing the complex surgical procedure."  ECF No. 46, Amend. Compl. ¶ 13.  Mr. Brown claims he consented to the surgery based on the understanding that Dr. Kallingal would serve as the primary surgeon "with no resident involvement."  Id.  Dr. Kallingal disputes this, claiming that he did not represent that he would perform the surgery alone and that he would not have done so because "[a] robotic assisted laparoscopic prostatectomy cannot be performed by one person."  Kallingal Decl. ¶ 19.

According to plaintiffs, BAMC changed the "primary surgeon" from Dr. Kallingal to Dr. Park, a resident physician at BAMC.  Amend. Compl. ¶ 13.  Plaintiffs allege that Dr. Kallingal never obtained Mr. Brown's authorization for Dr. Park to perform the procedure, and Dr. Kallingal instead falsified an informed consent form by forging Mr. Brown's signature.  Plaintiffs further allege that Dr. Park altered Mr. Brown's surgical dictation notes and fabricated a surgical counseling session to show that

she had visited with him prior to the surgery. Defendants similarly dispute these claims. According to defendants, Dr. Park was the Chief Resident and did not perform the surgery. As Chief Resident, Dr. Park conducted a preoperative clearance visit with Mr. Brown. ECF No. 75-6, Park Decl. ¶ 10. On the day of the surgery, Dr. Park provided bedside assistance by positioning, prepping, and draping the patient. Id. ¶ 13. Dr. Kallingal was the attending surgeon who controlled the robot and performed the operation on Mr. Brown on May 9, 2019. Kallingal Decl. ¶ 26.

According to plaintiffs, Dr. Park performed the procedure without Mr. Brown's consent. Plaintiffs allege that due to Dr. Park's lack of skill and experience, the procedure resulted in "severe post-operative complications," including "a life-threatening illness and physical injuries to [Mr. Brown's] body." Amend. Compl. at 8 ¶ 14. Mr. Brown has allegedly been required to undergo additional medical procedures to treat the resulting injuries.

On November 19, 2021, plaintiffs, proceeding pro se, filed a complaint against the United States, Dr. Kallingal, and Dr. Park, as well as against BAMC and Dr. Alexander Ernest ("Dr. Ernest"). ECF No. 1. Plaintiffs filed an amended complaint on September 12, 2022, alleging three separate causes of action for negligence based on medical battery and medical malpractice. ECF No. 46, Amend. Compl. Pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C), all pretrial proceedings in this case were referred to Magistrate Judge Baker. On February 10, 2023, the court granted in part and denied in part defendants' motion for substitution of parties and substituted the United States as a party for BAMC and Dr. Ernest. ECF No. 72.

On November 15, 2022, plaintiffs filed a motion for summary judgment. ECF No. 61. Defendants responded in opposition on November 29, 2022, ECF No. 62, and plaintiffs replied on December 2, 2022, ECF No. 63. On April 3, 2023, defendants filed a motion for summary judgment and motion for certification. ECF No. 75. Plaintiffs responded to the motion on April 13, 2023.[1] ECF No. 79. On June 14, 2023, Magistrate Judge Baker issued the report and recommendation, recommending that the court deny plaintiffs' motion for summary judgment and grant in part and deny in part defendants' motion. ECF No. 101, R&R. On June 28, 2023, defendants filed objections to the R&R, ECF No. 103, to which plaintiffs responded on June 29, 2023, ECF No. 105. On June 28, 2023, plaintiffs filed their own objections to the R&R. ECF No. 104. Defendants responded to the objections on July 11, 2023, ECF No. 108, and plaintiffs replied on July 12, 2023, ECF No. 109. As such, the motions are ripe for the court's review.

## II.  STANDARD

### A.  Order on R&R

This court is charged with conducting a de novo review of any portion of the magistrate judge's R&R to which specific, written objections are made. 28 U.S.C. § 636(b)(1). A party's failure to object is accepted as agreement with the conclusions of the magistrate judge. See Thomas v. Arn, 474 U.S. 140, 149–50 (1985). The recommendation of the magistrate judge carries no presumptive weight, and the responsibility to make a final determination rests with this court. Mathews v. Weber, 423

---

[1] Plaintiffs' response brief was seventy-nine pages, and plaintiffs did not file a motion to exceed the page limit. Although plaintiffs are proceeding pro se, they are not excused from the court's procedural rules. The court cautions plaintiffs against the practice in the future.

U.S. 261, 270–71 (1976).  The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge . . . or recommit the matter to the magistrate judge with instructions."  28 U.S.C. § 636(b)(1).  The court is charged with making a de novo determination of any portion of the R&R to which a specific objection is made.  Id.  However, in the absence of a timely filed, specific objection, the court reviews the R&R only for clear error.  Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005) (citation omitted).  Furthermore, "[a] party's general objections are not sufficient to challenge a magistrate judge's findings."  Greene v. Quest Diagnostics Clinical Laby's, Inc., 455 F. Supp. 2d 483, 488 (D.S.C. 2006) (citation omitted).  When a party's objections are directed to strictly legal issues "and no factual issues are challenged, de novo review of the record may be dispensed with."  Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982) (citation omitted).  Analogously, de novo review is unnecessary when a party makes general and conclusory objections without directing a court's attention to a specific error in a magistrate judge's proposed findings.  Id.

**B.  Motion for Summary Judgment**

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor. Id. at 255.

### C. Pro Se Litigants

Plaintiffs are proceeding pro se in this case. Pro se complaints and petitions should be construed liberally by this court and are held to a less stringent standard than those drafted by attorneys. See Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978), cert. denied, 439 U.S. 970, 99 (1978). A federal district court is charged with liberally construing a complaint or petition filed by a pro se litigant to allow the development of a potentially meritorious case. See Hughes v. Rowe, 449 U.S. 5, 9 (1980). Liberal construction, however, does not mean that the court can ignore a clear failure in the pleading to allege facts that set forth a cognizable claim. See Weller v. Dep't of Soc. Servs., 901 F.2d 387, 390–91 (4th Cir. 1990).

### III.  DISCUSSION

The court begins, as the magistrate judge did, with defendants' motion for certification. In their motion for certification, defendants moved to certify that the United States should be substituted as the sole party in place of Dr. Kallingal and Dr. Park. Since the court agrees and finds that plaintiffs have failed to rebut certification, the court

then proceeds to consider the cross-motions for summary judgment with the United

States as the sole defendant.

### A.  Motion for Certification

The Gonzalez Act immunizes medical workers "of the armed forces" from

personal liability for claims arising from the performance of medical or related health

care functions.  10 U.S.C. § 1089(a).  There is no dispute that Dr. Kallingal and Dr. Park

are employees of the armed forces for purposes of the statute.  The Fourth Circuit

recently issued an opinion summarizing the procedure in which such workers may be

immunized from suit:

> The Gonzalez Act immunizes federal employees in the medical field . . . by
> allowing the United States to substitute itself as a defendant upon
> certification by the Attorney General that the medical employee was acting
> within the scope of his employment at the time of the incident out of which
> the suit arose.  10 U.S.C. § 1089(c).
>
> After certification, the ball is in the plaintiff's court.  If a plaintiff does not
> challenge the Attorney General's certification, the certification is
> conclusive.  Gutierrez de Martinez v. Drug Enforcement Admin., 111 F.3d
> 1148, 1153 (4th Cir. 1997).  If a plaintiff challenges the Attorney General's
> certification, he must prove that the defendants were not acting within the
> scope of their employment.  [Maron v. United States, 126 F.3d 317, 323
> (4th Cir. 1997)].  If the plaintiff presents persuasive evidence refuting
> certification, the government must provide evidence and analysis
> supporting its conclusion that the conduct at issue was carried out within
> the scope of employment.  Id.  If the plaintiff's evidence carries the burden
> of proof, the district court may allow any discovery it deems appropriate.
> Gutierrez de Martinez, 111 F.3d at 1155.

Doe v. Meron, 929 F.3d 153, 160–61 (4th Cir. 2019) (footnote omitted).

Defendants previously moved to substitute the United States as the sole party in

place of Dr. Kallingal, Dr. Park, and then-defendants Dr. Ernest and BAMC.  The court

denied the motion as to Dr. Kallingal and Dr. Park, finding that at the relatively early

stage of litigation, plaintiffs had forecasted evidence that Dr. Kallingal and Park were not

acting within the scope of their employment. However, the court left the door open for defendants to later reassert that Dr. Kallingal and Dr. Park should be substituted "based on the totality of [] discovered evidence." ECF No. 72 at 13 n.6. Now that the discovery period has ended, defendants again move "to certify [d]efendants Kallingal and Park and dismiss them as individual defendants." ECF No. 75 at 1.

In support of their previous motion to substitute parties, defendants submitted a certification from then-Acting United States Attorney Corey F. Ellis attesting that defendants were at all relevant times "acting within the scope of their employment" and "providing medical services within the scope of their employment." ECF No. 26-1 at 1–2. The burden thus shifted to plaintiffs to present "persuasive evidence" that the individual defendants were acting outside of the scope of their employment. Meron 929 F.3d at 161; see Stephens v. United States, 2015 WL 4885502, at *6 (E.D. Va. Aug. 14, 2014) (explaining that a certification does not need to "provide details, explanations, or evidence" for the burden to shift to the plaintiff to prove by a preponderance of the evidence that the employee was acting outside of the scope of employment). The magistrate judge determined that plaintiffs failed to carry their burden. In their response to defendants' first motion to substitute, plaintiffs had offered only one valid basis[2] for refuting the certification: they averred that by fabricating medical records, Dr. Kallingal and Dr. Park were acting outside the scope of their employment. ECF No. 72 at 11, 14. After considering the evidence on summary judgment, the magistrate judge

---

[2] Plaintiffs had also argued that certification was improper because defendants performed surgery in a negligent manner, but as the court explained, an employee's conduct can be within the scope of his or her employment even if it was performed negligently. ECF No. 72 at 14 (citing Anderson v. Bessman, 365 S.W.3d 119, 125–26 (Tex. App.-Hous. 2011)).

recommended the court find that at this stage, there is no evidence that Dr. Kallingal or Dr. Park fabricated any medical records. Plaintiffs object to the recommendation.

The court previously determined that plaintiffs had forecasted evidence that defendants fabricated three records: (1) a note entered by Dr. Park documenting a visit on May 8, 2019, (2) intraoperative notes that listed Dr. Kallingal as the primary surgeon, and (3) Mr. Brown's informed consent form. ECF No. 72 at 11–12, 15. Upon review, the court finds that plaintiffs have not produced proof in the record that any of the documents were fabricated.

First, plaintiffs claimed that Dr. Park fabricated a note documenting a pre-operative visit on May 8, 2019—the day before the surgery—even though Mr. Brown did not see Dr. Park on May 8. ECF No. 79 at 14 (arguing that plaintiffs met Dr. Park for the first time on May 9, the day of the surgery); see also ECF No. 75-1, Mr. Brown Dep. 21:14–18. Mr. Brown further suggested that defendants falsely listed Dr. Park as the visiting doctor because "in order for [Dr. Park] to be the primary surgeon, she needed to have a note put in the record." Id. at 38:19–17. Defendants argued that the May 8 preoperative note was not fabricated because Dr. Park was indeed the one who visited with Mr. Brown on that date. According to defendants, it is standard practice for a Chief Resident like Dr. Park to perform preoperative clearance, which includes taking vitals and reading the results of urine samples to ensure the patient does not have an infection prior to surgery. Park Decl. ¶ 10; Kallingal Decl. ¶ 23. As their only real meaningful argument, plaintiffs claimed the note was fake because it resembled a note written by Dr. Kallingal documenting the visit that occurred on March 27, 2019. But as the magistrate judge explained, the notes are not exact duplicates. R&R at 18; compare ECF No. 52-6,

<u>with</u> ECF No. 52-9.  Moreover, Dr. Park's notes recorded Mr. Brown's vital signs on May 8, and plaintiffs do not dispute the accuracy of the notes.  R&R at 18.  Additionally, BAMC's computer system would have indicated if the note was altered, and there is no evidence that another physician created or altered the notes.  <u>Id.</u>  Plaintiffs fail to offer any new arguments or explanation in their objections, and the court finds that plaintiffs have failed to meet their burden of proving that the May 8 note was fraudulently created.

Second, plaintiffs attached (1) a "Nurse Intraoperative Note" dated May 9, 2019, that listed Dr. Park as Mr. Brown's primary surgeon and (2) an "Operative Report" dated May 9, 2019, that listed Dr. Kallingal as the primary surgeon.  ECF Nos. 61-2, 61-5.  Prior to discovery, the court found that the exhibits may have suggested at least one of the documents was falsified.  Plaintiffs claimed that the note listing Dr. Park as an assistant was false.  <u>See</u> ECF No. 61-5 ("The Operative Report is direct [] proof of the Defendant's intent to deceive by identifying the resident as the assistant and the attending as the primary surgeon when the Nursing Intraoperative note clearly identifies the resident as the primary surgeon.").  Since then, defendants have provided evidence confirming that Dr. Kallingal performed the surgery and Dr. Park assisted.  As for why Dr. Park might have been listed as the surgeon on the Nurse Intraoperative Note, defendants explained that the resident is responsible for entering post-operative orders and dictating the operative case.  Kallingal Decl. ¶ 27.  Even if the court did not find this explanation convincing, plaintiffs have failed to meet their burden by a preponderance of the evidence.  In their objections, plaintiffs merely rely on this court's preliminary finding, ECF No. 104 at 10–11, meaning that plaintiffs fail to offer evidence of

fabrication.  Accordingly, the Operative Note does not rebut the Attorney General's certification.

Finally, plaintiffs argued that defendants forged Mr. Brown's signature onto a "Request for Administration of Anesthesia" form (the "consent form").  The consent form stated that the patient understood the procedure would be performed by Dr. Kallingal and "other staff and Resident team."  ECF No. 61-4.  The magistrate judge found that plaintiffs had failed to offer more than mere allegations in their unverified pleadings to support their claim.  R&R at 19.  The magistrate judge also highlighted that in his deposition, Mr. Brown admitted he signed a consent form on May 9, 2019, and testified that he "didn't read it" prior to signing it.  Id. at 20; Mr. Brown Dep. at 36:5–15. Mrs. Brown also testified that Mr. Brown electronically signed a consent form on the morning of his surgery.  ECF No. 75-2, Mrs. Brown Dep. at 36:1–9.  A different resident physician, Dr. Nancy Gillcrist ("Dr. Gillcrist"), stated that she obtained Mr. Brown's electronic signature on the consent form.  ECF No. 75-9, Gillcrist Decl. ¶¶ 8–9.

In their objections, plaintiffs argue that Drs. Kallingal, Park, and Gillcrist all "lied to this Court" about obtaining Mr. Brown's informed consent.  ECF No. 104 at 4. Plaintiffs claim that defendants' attorneys procured false affidavits in violation of government ethics rules.  ECF No. 104 at 5–6.  Without additional evidence, however, these accusations are unsupported.  See also R&R at 19 (explaining that plaintiffs had only provided unverified allegations that plaintiffs forged Mr. Brown's signature).

Notably, plaintiffs argue that they should be allowed to submit an expert report from Patricia Hale, a forensic document examiner and handwriting expert.  ECF No. 104 at 8; ECF No. 104-3 at 4.  Hale would purportedly testify that someone forged Mr.

Brown's signature on the medical consent form.  ECF No. 104 at 7–8.  In the scheduling

order, plaintiffs had until September 6, 2022, to identify expert witnesses.  ECF No. 28

¶ 2.  Plaintiffs argue that the affidavits of Drs. Kallingal, Park, and Gillcrist were

submitted after the deadline of October 4, 2022, and had plaintiffs known that defendants

would submit "false and misleading affidavits," plaintiffs would have provided the

handwriting expert report "immediately."  Id. at 8.

There are several issues with plaintiffs' argument.  First, the October 4, 2022

deadline referred to defendants' deadline to file affidavits of records custodians.  ECF

No. 28 ¶ 4.  Each of the three witnesses, including Gillcrist, are fact witnesses and not

record custodians.  Defendants were permitted to file affidavits in support of their motion

for summary judgment.  See Fed. R. Civ. P. 56(c)(4).  Moreover, as defendants note,

plaintiffs have claimed from the inception of this case that defendants forged Mr.

Brown's signature on the medical consent form, and the parties explored those

allegations in discovery.  ECF No. 108 at 2.  Plaintiffs were aware well before defendants

submitted the affidavits that defendants were claiming they had properly obtained Mr.

Brown's signature.  Plaintiffs could have obtained a handwriting expert prior to the

expert disclosure deadline, could have moved to amend the scheduling order to allow

them to submit an expert during the discovery period, or could have requested leave to

submit the expert report in response to defendants' motion for summary judgment.

Plaintiffs did not elect any of those options, and the court declines to allow them to

supplement their motion with Hale's report.

Even if the court were to allow plaintiffs to file the belated report, it is unlikely

the report would move the needle.  Plaintiffs have the burden of proving with persuasive

evidence that Dr. Kallingal and Dr. Park were acting outside the scope of their employment.  Plaintiffs proffer that Hale would opine that Mr. Brown's signature was forged on the consent form, but that explanation is at odds with Mr. and Mrs. Brown's own testimony that Mr. Brown signed a consent form.  Since plaintiffs have failed to provide persuasive evidence that the doctors fabricated medical records, they have failed to prove that Dr. Kallingal and Dr. Park took any actions outside the scope of their employment.  The court adopts the magistrate judge's recommendation, dismisses Dr. Kallingal and Dr. Park from this action, and substitutes the United States in their place.

### B.  Motions for Summary Judgment

The magistrate judge grouped plaintiffs' negligence claims into two categories: (1) medical battery based on Dr. Park's actions taken without Mr. Brown's informed consent (Count I), and (2) medical malpractice based on Dr. Kallingal and Dr. Ernest's failure to provide standard medical care and failure to supervise Dr. Park (Counts II and III).  The magistrate judge also considered the claims asserted by Mrs. Brown and whether she could recover for loss of consortium.  The court reviews each issue in turn.

### 1.  Medical Battery

There is no dispute that plaintiffs' negligence claims are governed by Texas law. See also RAI Credit LLC v. WeiserMazars LLP, 2013 WL 3776514, at *3 (D.S.C. June 5, 2013) (explaining that South Carolina follows the doctrine of lex loci delicti, and under the lex loci rule, tort actions are governed by the law of the place of the wrong).  Under Texas law, medical battery "generally involves claims that a doctor performed acts on the patient without consent."  Baribeau v. Gustafson, 107 S.W.3d 52, 61 (Tex. App.-San Antonio 2003, pet. denied).  In their motion for summary judgment, defendants argued

that by law, no medical battery occurred because Texas law imposes no requirement to disclose an assisting surgeon's level of participation or experience. ECF No. 75 at 11 (citing Benge v. Williams, 472 S.W.3d 684, 709 (Tex. App.-Hous. 2014), aff'd, 548 S.W.3d 466 (Tex. 2018)). The magistrate judge agreed, explaining that in two comparable cases, Texas courts held that a medical-battery plaintiff could not prevail under a theory that the assisting surgeon was not his or her chosen surgeon where the plaintiff had consented to participation by other staff members, including residents. R&R at 22–23 (citing id. at 689–90; Haynes v. Beceiro, 219 S.W.3d 24, 25 (Tex. App.-San Antonio 2006, pet. denied)). Since Mr. Brown's consent form stated that his surgery would be performed by Dr. Kallingal and "other staff and Resident team," ECF No. 75-9 at 3, the magistrate judge determined that there was no cause of action for medical battery under Texas law.

Plaintiffs do not dispute the applicable law in their objections. Instead, they strongly reiterate their belief that the consent form presented by defendants contains a forged signature. ECF No. 104 at 11–12. But as the court outlined above, plaintiffs offer no evidence that the consent form was forged. Rather, all the evidence suggests that the consent form is true and correct: (1) Mr. Brown and Mrs. Brown acknowledged in their depositions that a consent form had been signed; (2) Dr. Gillcrist stated that it was common practice for interns to perform the consent procedure and that her signature on the form indicates she obtained Mr. Brown's consent; and (3) Dr. Kallingal would have never stated on the consent form that he would perform the robotic assisted laparoscopic prostatectomy without assistance because the procedure cannot be done by one person alone. There is no dispute of material fact that Mr. Brown consented to the assistance of

others during his procedure.  As a result, under Texas law, Mr. Brown has no cause of

action for medical battery even if Dr. Park "did more than merely assist" Dr. Kallingal.[3]

Haynes, 219 S.W.3d at 26.  The court adopts the R&R and grants summary judgment in

defendants' favor on plaintiffs' medical battery claim.

### 2. Medical Malpractice

Count II of plaintiffs' amended complaint alleges that Dr. Kallingal and Dr.

Ernest deviated from the acceptable standard of medical care and treatment both during

and after Mr. Brown's surgery, resulting in physical injuries.  Amend. Compl. at 10.  The

magistrate judge construed the claim to encompass Dr. Park's alleged actions.  R&R at

24.  Count III alleges that Dr. Kallingal and Dr. Ernest failed to properly supervise Dr.

Park during the surgery.  Amend. Compl. at 10.  Under Texas law, a plaintiff asserting

medical malpractice has the burden of proving: "(1) a duty by the physician or hospital to

act according to an applicable standard of care; (2) a breach of that standard of care; (3)

an injury, and (4) a causal connection between the breach of care and the injury."

Quijano v. United States, 325 F.3d 564, 567 (5th Cir. 2003) (citing Mills v. Angel, 995

S.W.2d 262, 267 (Tex. App.-Texarkana 1999, no. pet.)).  A plaintiff is generally required

to provide expert testimony to establish the elements of medical malpractice.  Hood v.

Phillips, 554 S.W.2d 160, 165–66 (Tex. 1977).  Expert testimony is particularly

important when proving causation.  See Garcia v. Palestine Mem'l Hosp., 2002 WL

192359, at *2 (Tex. App.-Hous. Feb. 7, 2002, no pet.) (explaining that even in cases

---

[3] In any event, the R&R determined based on the evidence that Dr. Kallingal
served as the primary surgeon.  R&R at 10.  The court finds that the evidence supports
that conclusion.

where expert testimony is not needed to show standard of care or breach, it is required to show causation).

The magistrate judge found the events following the radical prostatectomy to be particularly important here. After Mr. Brown was discharged on May 11, 2019, he returned to BAMC on May 14, 2019, "complaining of abdominal pain, nausea and vomiting." ECF No. 75-11 at 3. A CT scan and blood work were performed, and Mr. Brown was discharged the next day with no diagnosis for anastomosis leakage. Id. On May 20, 2019, Mr. Brown went to the BAMC emergency room with similar complaints. Id. A repeat CT scan showed bilateral pelvic fluid collection, and a single drain was performed to treat the collection. Id. Mr. Brown returned to the emergency room again on May 28, 2019, with a 101.5-degree fever. Id. A CT scan showed the pelvic drain was no longer draining the fluid collection properly, and an interventional radiology procedure was done to reposition and upsize the drain. Id.

In support of their motion for summary judgment, plaintiffs provided an expert report from Dr. Dudley Seth Danoff ("Dr. Danoff"). ECF No. 61-3. The magistrate judge declined to credit Dr. Danoff's conclusion that during the radical prostatectomy, Dr. Park should have "use[d] a medically accepted technique" to "identify Mr. Brown's anatomy prior to clipping and cutting structure to remove his prostate gland and attached seminal vesicles." R&R at 26 (quoting ECF No. 61-3 at 3). The magistrate judge reasoned that Dr. Danoff never offered a medically accepted technique. However, the magistrate judge found that Dr. Danoff had adequately stated his conclusion about Dr.

Park's failure[4] to diagnose Mr. Brown's anastomosis leakage <u>after</u> the procedure. <u>Id.</u>

According to Dr. Danoff,

> Dr. Park failed to diagnose the urethrovesical anastomotic leak in a timely manner, specifically when it was clinically significant and when intervention was required. Moreover, the standard for medical care required Dr. Park to timely diagnose Mr. Brown's bladder injury and transfer him to a higher level of care. Dr. Park breached the standard of care by failing to timely diagnose and treat the anastomotic leak injury, sepsis, and bladder injury, and transfer him to a high level of care.

ECF No. 61-3 at 4. According to the magistrate judge, Dr. Danoff identified the standard of care and determined that the breach of that standard proximately caused Mr. Brown's injuries. In doing so, the magistrate judge dismissed defendants' argument that their own expert, Dr. Daniel Canter ("Dr. Canter"), had stated that the first CT scan did not indicate any significant findings. R&R at 28 (citing ECF No. 75-11 at 3).[5] In other words, the magistrate judge found that the reports presented a fact issue about "which expert witness to credit," and the issue was properly left to the jury. <u>Id.</u>

In their objections to the R&R, defendants argue that the magistrate judge erred as a matter of law because in a failure-to-diagnose case, an "expert report must explain <u>how</u> the complained-of harm would not have occurred if the diagnosis had been made in a timely fashion." <u>Kapoor v. Est. of Klovenski</u>, 2010 WL 3721866, at *4 (Tex. App.-Hous.

---

[4] The magistrate judge found that since Dr. Danoff only provided conclusions about Dr. Park specifically, plaintiffs had failed to allege any failures by Dr. Kallingal and Dr. Ernest. Plaintiffs do not object to the finding; therefore, the court finds that the medical malpractice claim against the United States may only be tried based on the actions of Dr. Park.

[5] Defendants argue that the magistrate judge erred in finding that Dr. Danoff's report was sufficient because in defendants' view, the magistrate judge needed to rely on Dr. Canter's report to make sense of Dr. Danoff's report. ECF No. 103 at 4. The court disagrees. To be sure, Dr. Canter's report more clearly stated the background on Mr. Brown's medical procedures, but the magistrate judge could have relied on Dr. Danoff's report for the fundamental information. <u>See</u> ECF No. 61-3 at 2–3.

Sept. 23, 2010, no pet.) (emphasis in ECF No. 103 at 3). According to defendants, Dr.

Danoff did not explain how a timely diagnosis of the anastomotic leak would have

prevented Mr. Brown's injuries. ECF No. 103 at 3–4.

Upon review, the court finds that Dr. Danoff's report has met the bare minimum

for establishing causation.[6] While defendants are correct that an expert must explain

causation, it is equally well-established that "[t]he plaintiff in a medical malpractice case

may prove his cause of action by circumstantial evidence." Kieswetter v. Ctr. Pavilion

Hosp., 662 S.W.2d 24, 29 (Tex. App.-Hous. 1983, no writ) (citing Sears v. Cooper, 574

S.W.2d 612, 615 (Tex. App.-Hous. 1978, writ ref'd n.r.e.)). The plaintiff is not required

to prove legal causation in terms of medical certainty but must show at least a reasonable

probability that his complications were caused by negligence. Id. (citations omitted).

Furthermore, an expert's report "need not marshal all the plaintiff's proof." In re

Benavides, 2009 WL 1617838, at *3 (Tex. App.-San Antonio 2009, pet. denied) (citing

Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 878 (Tex. 2001)).

Here, Dr. Danoff stated that Dr. Park failed to timely diagnose Mr. Brown's

anastomotic leak from the diagnostic tests and that this "substantial

delay[] . . . proximately caused him to undergo additional treatment for two years." ECF

No. 61-3 at 4. The court agrees with defendants that Dr. Danoff did not provide a model

---

[6] Unfortunately, the court has little to lean on from plaintiffs because their response to defendants' objections misses the mark. Plaintiffs' response focuses on the issue of consent. For example, they argue that expert testimony is not required to prove a lack of consent. ECF No. 105 at 6. Those arguments are nonresponsive because defendants only object to the magistrate judge's recommendation on the medical malpractice claim—and specifically, the magistrate judge's handling of causation. Plaintiffs do not respond with any arguments about establishing causation under Texas medical malpractice law. Nevertheless, the court rules on defendants' objections based on the record evidence.

explanation on causation.  Nevertheless, the court finds that the report is sufficient. Unlike experts in some cases where courts found no proof of causation, Dr. Danoff did not claim that the delay <u>may</u> have been a cause for Mr. Brown's injuries—he clearly stated that the delay caused the injuries.  <u>See</u> <u>Bradley v. Rogers</u>, 879 S.W.2d 947, 956, 958 (Tex. App.- Hous. 1994, writ denied) (explaining that evidence of causation must rise above "mere conjecture or possibility" and declining to credit an expert report that stated the patient "may have been saved").  Texas courts have concluded that reports are sufficient where causation is "shown by an expert's explaining a chain of events that starts with a doctor's negligence and ends with a patient's injury."  <u>Hancock v. Rosse</u>, 2020 WL 479589, at *7 (Tex. App.-Fort Worth Jan. 30, 2020, pet. denied); <u>see Owens v. Handyside</u>, 478 S.W.3d 172, 189 (Tex. App.-Hous. 2015, pet. denied) (op. on reh'g) (reversing trial court's decision and finding that an expert report was sufficient where the report stated that "[i]f [Owens] was admitted [to the hospital], if a neurology consultation was obtained, and if a lumbar puncture had been done[,] it is medically probable that her condition . . . would have been diagnosed earlier and her vision would have been saved with treatment") (alterations in original).  The court concludes that Dr. Danoff's report "presented an 'objective good faith effort' to inform [the parties] of the causal relationship" between Dr. Park's alleged delay and the injuries claimed.  <u>Owens</u>, 478 S.W.3d at 191.  Accordingly, the court overrules defendants' objections to the R&R. This action will proceed as a medical malpractice claim against the United States arising out of Dr. Park's alleged failure to diagnose and treat Mr. Brown's anastomotic leak injury.

### C.  Mrs. Brown's Claims

In their motion for summary judgment, defendants moved for summary judgment on all claims asserted by Mrs. Brown.  ECF No. 75 at 18–19.  Defendants argued that plaintiffs had alleged no facts about any personal injuries that Mrs. Brown suffered.  In the R&R, the magistrate judge determined that the amended complaint had sufficiently alleged damages, and under Texas law, loss of consortium is an element of damages.  R&R at 30 (citing Rodriguez v. Blaine Larsen Farms, Inc., 2022 WL 18034478, at *1 (N.D. Tex. Apr. 21, 2022)) (other citations omitted).  As such, the magistrate judge determined that Mrs. Brown was permitted to seek loss of consortium.

Defendants do not object to the magistrate judge's legal conclusion.  Instead, they maintain that this action should be dismissed because Mr. Brown's medical malpractice claim fails.  ECF No. 103 at 4–5.  Since the court determined above that Mr. Brown's medical malpractice claim narrowly survives summary judgment, the court adopts the magistrate judge's recommendation that plaintiffs may seek damages in this action, including for Mrs. Brown's loss of consortium.

### IV.   CONCLUSION

For the foregoing reasons, the court **ADOPTS** the R&R, **DENIES** plaintiffs' motion for summary judgment, and **GRANTS IN PART** and **DENIES IN PART** defendants' motion for summary judgment.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 5, 2023**
**Charleston, South Carolina**