## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| HARREY ANTHONY BROWN and KESHA LYNETTE BROWN, | ) ) ) | |
| Plaintiffs, | ) ) | No. 2:21-cv-03801-DCN |
| vs. | ) ) | **ORDER** |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) | |

This matter is before the court on plaintiffs Harrey Anthony Brown ("Mr. Brown") and Kesha Lynette Brown's ("Mrs. Brown") (together, "plaintiffs") motion for reconsideration of this court's order, ECF No. 110, denying plaintiffs' motion for summary judgment, ECF No. 61, and granting in part and denying in part defendants United States of America (the "United States" or the "government"), Dr. George J. Kallingal ("Dr. Kallingal"), and Grace E. Park's ("Dr. Park") (together, "defendants") motion for summary judgment and motion for certification, ECF No. 75.  ECF No. 136. For the reasons set forth below, the court grants the motion for reconsideration.

## I.  BACKGROUND

This case arises out of an allegedly failed medical procedure that Mr. Brown underwent in May 2019.  Mr. Brown was diagnosed with prostate cancer in December 2018, and in March 2019, he and his wife attended a comprehensive prostate cancer clinic at the Brooke Army Medical Center ("BAMC") Urology Clinic in Fort Sam Houston, Texas to discuss various treatment options.  Plaintiffs allege that they met with Dr. Kallingal, a urology oncology surgeon at BAMC, who recommended that Mr. Brown

undergo a robotic-assisted laparoscopic radical prostatectomy. Defendants dispute this account and claim that before meeting Dr. Kallingal, plaintiffs met with several other physicians. For example, defendants claim that on February 4, 2019, plaintiffs met with "Dr. Morales," who purportedly wrote in his visit notes that he had recommended "active surveillance" for Mr. Brown's "very low risk prostate cancer." ECF No. 75-5, Kallingal Decl. ¶ 11. Mr. Brown allegedly "still prefer[red] surgery," so Dr. Kallingal met Mr. Brown for the first time on March 27, 2019. Id. ¶ 11, 13. At the visit, Mr. Brown elected to undergo the robotic-assisted laparoscopic prostatectomy.

Plaintiffs allege that Dr. Kallingal claimed to possess "extensive experience and skill with performing the complex surgical procedure." ECF No. 46, Amend. Compl. ¶ 13. Mr. Brown claims he consented to the surgery based on the understanding that Dr. Kallingal would serve as the primary surgeon "with no resident involvement." Id. Dr. Kallingal disputes this, claiming that he did not represent that he would perform the surgery alone and that he would not have done so because "[a] robotic assisted laparoscopic prostatectomy cannot be performed by one person." Kallingal Decl. ¶ 19.

According to plaintiffs, BAMC changed the "primary surgeon" from Dr. Kallingal to Dr. Park, a resident physician at BAMC. Amend. Compl. ¶ 13. Plaintiffs allege that Dr. Kallingal never obtained Mr. Brown's authorization for Dr. Park to perform the procedure, and Dr. Kallingal instead falsified an informed consent form by forging Mr. Brown's signature. Plaintiffs further allege that Dr. Park altered Mr. Brown's surgical dictation notes and fabricated a surgical counseling session to show that she had visited with him prior to the surgery. Plaintiffs allege that due to Dr. Park's lack of skill and experience, the procedure resulted in "severe post-operative complications,"

2

including "a life-threatening illness and physical injuries to [Mr. Brown's] body."
Amend. Compl. at 8 ¶ 14.  Mr. Brown has been required to undergo additional medical
procedures to treat the resulting injuries.

Defendants dispute these claims.  Instead, defendants assert that Dr. Park was the
Chief Resident and did not perform the surgery.  As Chief Resident, Dr. Park conducted a
preoperative clearance visit with Mr. Brown.  ECF No. 75-6, Park Decl. ¶ 10.  On the day
of the surgery, Dr. Park provided bedside assistance by positioning, prepping, and
draping the patient.  Id. ¶ 13.  Dr. Kallingal was the attending surgeon who controlled the
robot and performed the operation on Mr. Brown on May 9, 2019.  Kallingal Decl. ¶ 26.

On November 19, 2021, plaintiffs, proceeding pro se, filed a complaint against the
United States, Dr. Kallingal, and Dr. Park, as well as against BAMC and Dr. Alexander
Ernest ("Dr. Ernest").  ECF No. 1.  Plaintiffs filed an amended complaint on September
12, 2022, alleging three separate causes of action for negligence based on medical battery
and medical malpractice.  ECF No. 46, Amend. Compl.  Pursuant to 28 U.S.C.
§ 636(b)(1)(A) and (B) and Local Civ. Rule 73.02(B)(2)(g) (D.S.C), all pretrial
proceedings in this case were referred to Magistrate Judge Baker.  On February 10, 2023,
the court granted in part and denied in part defendants' motion for substitution of parties
and substituted the United States as a party for BAMC and Dr. Ernest.  ECF No. 72.

On November 15, 2022, plaintiffs filed a motion for summary judgment.  ECF
No. 61.  Defendants responded in opposition on November 29, 2022, ECF No. 62, and
plaintiffs replied on December 2, 2022, ECF No. 63.  On April 3, 2023, defendants filed a
motion for summary judgment and motion for certification.  ECF No. 75.  Plaintiffs
responded to the motion on April 13, 2023.  ECF No. 79.  The magistrate judge issued a

report and recommendation on June 14, 2023.  ECF No. 101.  On September 5, 2023, the

court adopted the R&R and denied plaintiffs' motion for summary judgment, ECF No.

61, and granted in part and denied in part defendants' motion for summary judgment,

ECF No. 75.  ECF No. 110 (the "Summary Judgment Order").  In that order, the court

dismissed Drs. Kallingal and Park and substituted the United States in their place.  Id. at

13.

On February 21, 2024, plaintiffs, proceeding pro se, filed a motion for

reconsideration of the Summary Judgment Order.  ECF No. 136.  On March 4, 2024, the

government responded in opposition, ECF No. 140, and supplemented that response three

days later on March 7, 2024, with additional documents that the government provided to

the plaintiffs after the plaintiffs indicated that they had not seen those forms, ECF No.

143.  Plaintiffs replied on March 11, 2024.  ECF No. 144.  The court held a status

conference on March 18, 2024, in which plaintiffs further explained their position in

response to the government's supplement.  ECF No. 147.  As such, the motion is fully

briefed and now ripe for the court's review.

## II.  STANDARD

### A.  Motion for Reconsideration

A motion for reconsideration is generally raised via Rules 59 and 60 of the

Federal Rules of Civil Procedure.  Rule 59(e) allows a party to file a motion to alter or

amend a judgment.  Fed. R. Civ. P. 59(e).  The rule provides an "extraordinary remedy

which should be used sparingly."  Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396,

403 (4th Cir. 1998) (internal quotation marks and citation omitted).  When a motion to

reconsider brought pursuant to Rule 59(e) is untimely, courts construe the motion as one

filed under Rule 60(b). <u>See</u> <u>Robinson v. Wix Filtration Corp. LLC</u>, 599 F.3d 403, 412

(4th Cir. 2010); <u>see also</u> <u>J.C. v. Fairfax Cnty. Pub. Schs.</u>, 2023 WL 5032784, at *1 n.1

(4th Cir. Aug. 8, 2023) (explaining that plaintiffs' motion was filed more than 28 days

after the district court entered its dismissal order, so the motion is properly construed

under Fed. R. Civ. P. 60(b)); <u>Wriglesworth v. Esper</u>, 765 F. App'x 6 (4th Cir. 2019) (per

curiam) (same). Accordingly, the court construes plaintiffs' motion as a Rule 60(b)

motion.

> Federal Rule of Civil Procedure 60(b) states that,
>
> the court may relieve a party or its legal representative from a final
> judgment, order, or proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not
> have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic),
> misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> (5) the judgment has been satisfied, released, or discharged; it is based on
> an earlier judgment that has been reversed or vacated; or applying it
> prospectively is no longer equitable; or
>
> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

### B. Motion for Summary Judgment

Summary judgment shall be granted if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine dispute as to any

material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ.

P. 56(c). "By its very terms, this standard provides that the mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

"Only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." Id. at 248. "[S]ummary

judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Id. "[A]t the summary judgment stage the judge's function is not himself to weigh the

evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial." Id. at 249. The court should view the evidence in the light most

favorable to the non-moving party and draw all inferences in its favor. Id. at 255.

### C. Pro Se Litigants

Plaintiffs are proceeding pro se in this case. Pro se complaints and petitions

should be construed liberally by this court and are held to a less stringent standard than

those drafted by attorneys. See Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978).

A federal district court is charged with liberally construing a complaint or petition filed

by a pro se litigant to allow the development of a potentially meritorious case. See

Hughes v. Rowe, 449 U.S. 5, 9 (1980). Liberal construction, however, does not mean

that the court can ignore a clear failure in the pleading to allege facts that set forth a

cognizable claim. See Weller v. Dep't of Soc. Servs., 901 F.2d 387, 390–91 (4th Cir.

1990).

### III.  DISCUSSION

The court first clarifies some of plaintiffs' assertions that they made in their briefs.  Next, the court turns to the question of whether the government's supplement is new evidence that creates a genuine dispute of material fact as to whether Mr. Brown consented to the surgery, thus reviving his medical battery claim.

### A.  Clarifications

Prior to delving into the merits of the instant motion to reconsider, the court finds it necessary to clarify a few aspects of this case for the parties, to ensure all parties are prepared for trial with appropriate witnesses and evidence.  The court reviews its summary judgment holding on medical malpractice, explains the role of expert witnesses, and defines admissible evidence.

### 1.  Medical Malpractice

To date, the court has not found in favor of either party on the medical malpractice claim—stated differently, neither party has proven or disproven that claim. In the Summary Judgment Order, the court denied both parties' motions for summary judgment as to the medical malpractice claim.  The undersigned will determine whether plaintiffs have met their burden of proof on that claim <u>after</u> all the evidence is presented at trial and after each party files their findings of fact and conclusions of law in the wake of the trial.

Medical malpractice requires the plaintiffs prove: (1) a duty by the physician or hospital to act according to an applicable standard of care; (2) a breach of that standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury. <u>Quijano v. United States</u>, 325 F.3d 564, 567 (5th Cir. 2003) (applying Texas law).

First and second, to establish a breach of a duty, the plaintiff must first establish an applicable standard of care. Windrum v. Kareh, 581 S.W.3d 761, 768 (Tex. 2019). "In a medical malpractice negligence case, the standard of care is what a doctor of ordinary prudence in that particular field would or would not have done under the circumstances. Id. In this context, for the plaintiffs to meet their burden of proof for the first and second elements of the claim, the plaintiffs must "establish that the physician-defendant has undertaken a mode or form of treatment which a reasonable and prudent member of the medical profession would not have undertaken under the same or similar circumstances." Hood v. Phillips, 554 S.W.2d 160, 165 (Tex. 1977) (emphasis added). The circumstances to be considered include, but are not limited to, the expertise of and means available to the physician-defendant, the health of the patient, and the state of medical knowledge. Id. "Unless that standard of care is common knowledge or within the experience of laymen, testimony from a medical expert is required to satisfy the plaintiff's threshold burden of proof." Coleman v. United States, 912 F.3d 824, 829 (5th Cir. 2019) (applying Texas law). Third, plaintiffs must prove that an injury occurred. See Quijano, 325 F.3d at 567.

Fourth and finally, the plaintiffs must prove that the injury was caused by the doctor's negligence. Proximate cause consists of (1) cause in fact, and (2) foreseeability. Windrum, 581 S.W.3d at 777. Cause in fact "is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." Id. (citation omitted). The Texas Supreme Court has long held "that a defendant's act or omission need not be the sole cause of an injury, as long as it is a substantial factor in bringing about the injury." Id. at 777–78 (quoting Bustamante v.

Ponte, 529 S.W.3d 447, 457 (Tex. 2017)).  An injury may also have more than one proximate cause.  Id. at 778.  Additionally, where there is evidence of other plausible causes of the injury that could be negated, the plaintiff must provide evidence that excludes those plausible causes with reasonable certainty.  See Bustamante, 529 S.W.3d at 456 (citing Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 720 (Tex. 1997)).  Stated differently, the ultimate standard of proof on the causation issue "is whether, by a preponderance of the evidence,[1] the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred."  Kramer v. Lewisville Mem'l Hosp., 858 S.W.2d 397, 400 (Tex. 1993) (footnote added).

"Texas Courts have long recognized the necessity of expert testimony in medical-malpractice cases."  Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 876 (Tex. 2001).  "It is not enough for an expert simply to opine that the defendant's negligence caused the plaintiff's injury.  The expert must also, to a reasonable degree of medical probability, explain how and why the negligence caused the injury."  Jelinek v. Casas, 328 S.W.3d 526, 536 (Tex. 2010).  The plaintiff's "expert must explain why the inferences drawn are medically preferable to competing inferences that are equally consistent with the known facts."  Id.  In a negligence case, plaintiffs must "adduce evidence of a 'reasonable medical probability' or 'reasonable probability'" that the defendants' negligence caused their injury—that is, it must be "'more likely than not' that the ultimate harm or condition resulted from such negligence."[2]  Bustamante, 529 S.W.3d

_____

[1] The preponderance of the evidence means "the greater weight of the credible evidence."  Murff v. Pass, 249 S.W.3d 407, 409 n.1 (Tex. 2008) (quoting State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979)).
[2] The Fifth Circuit has noted that the medical malpractice inquiry into causation is sometimes described as a "reasonable medical probability" that the alleged negligence

at 456 (citation omitted); see also Jelinek, 328 S.W.3d at 536 ("When the only evidence of a vital fact is circumstantial, the expert cannot merely draw possible inferences from the evidence and state that 'in medical probability' the injury was caused by the defendant's negligence."); Cruz ex rel Cruz v. Paso Del Norte Health Found., 44 S.W.3d 622, 630 (Tex. App. 2001) ("With regard to cause-in-fact, the plaintiff must establish a causal connection based upon 'reasonable medical probability,' not mere conjecture, speculation, or possibility.").  The trier of fact may decide the issue of proximate causation in medical malpractice cases when: (1) general experience and common sense will enable layman fairly to determine the causal relationship between the event and the condition; (2) scientific principles, usually proved by expert testimony, establish a traceable chain of causation from the condition back to the event; and (3) a probable causal relationship is shown by expert testimony.  Parker v. Emps. Mut. Liab. Ins. Co., 440 S.W.2d 43, 46 (Tex. 1969).

At the upcoming bench trial, plaintiffs bear the burden of proving, in accordance with the foregoing, that Dr. Park failed to timely diagnose and treat Mr. Brown's anastomotic leak which constituted a breach of the applicable standard of care that proximately caused Mr. Brown's injuries.  As the R&R noted, there is a genuine dispute of material fact as to the standard of care provided by Dr. Park and a genuine dispute of material fact as to whether the anastomotic leakage proximately caused Mr. Brown's

---

proximately caused the harm and sometimes described as determining whether the harm was a foreseeable result of the negligence, and the negligence was a substantial factor in bringing about the harm, and without which the harm would not have occurred.  Guile v. United States, 422 F.3d 221, 225 & n.3 (5th Cir. 2005) (applying Texas law).  Under both inquiries, the standard is the same.  Id. at 225 n.3.

injuries.  See R&R at 28–29.  Thus, neither party has proven or disproven this claim—
such a determination is reserved for the factfinder at trial.

### 2. Expert Witnesses

The court's decision to allow plaintiffs to name Patricia Hale and Mrs. Brown as
expert witnesses does not constitute "new evidence" nor does it revive the medical
battery claim.  In fact, expert testimony may only come into evidence if it meets the
applicable standard enunciated under the Federal Rules of Evidence and Federal Rule of
Civil Procedure 26(a)(2).

On March 20, 2024, the court sent the parties an email specifying the differences
between lay witnesses and expert witnesses in response to plaintiffs' request to name a
new expert witness to testify as to the relevant medical records at BAMC.  Such a
distinction bears repeating.  There are two types of witnesses: expert witnesses and fact
witnesses.  Federal Rule of Evidence 702 governs who may qualify as an expert witness
and stipulates that a qualified expert witness may testify in the form of an opinion.  The
purpose of an expert witness is to assist the trier of fact to understand the evidence or to
determine a fact in issue.

In contrast, a lay witness, also known as a fact witness, is a person who is not
testifying as an expert but who can "give an opinion if it is '(a) rationally based on the
perception of the witness and (b) helpful to a clear understanding of the witness'
testimony or the determination of a fact in issue.'"  Certain Underwriters at Lloyd's,
London v. Sinkovich, 232 F.3d 200, 203 (4th Cir. 2000) (quoting Fed. R. Evid. 701).  In
other words, Federal Rule of Evidence 701 permits lay witnesses to "offer an opinion on
the basis of relevant historical or narrative facts that the witness has perceived."  Id.  The

critical distinction between fact witness (Rule 701) and expert witness (Rule 702) testimony is that an expert witness "must possess some specialized knowledge or skill or education that is not in the possession of the jurors." Id. Unlike a lay witness under Rule 701, an expert can answer hypothetical questions and offer opinions not based on first-hand knowledge because her opinions presumably "will have a reliable basis in the knowledge and experience of h[er] discipline." Id. (citing Daubert v. Merrell Dow Pharms., 509 U.S. 579, 592 (1993)).

Federal Rule of Evidence 702 dictates what evidence is admissible testimony by expert witnesses. It provides,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 "appoints trial judges as 'gatekeepers of expert testimony' to protect the judicial process from 'the potential pitfalls of junk science.'" Sardis v. Overhead Door Corp., 10 F.4th 268, 275 (4th Cir. 2021) (quoting United States v. Bonner, 648 F.3d 209, 215 (4th Cir. 2011)). The judge must "ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Nease v. Ford Motor Co., 848 F.3d 219, 229–30 (4th Cir. 2017) (alterations adopted) (citing Daubert, 509 U.S. at 597).

In sum, both parties must ensure to qualify their respective expert witnesses in accordance with Federal Rule of Evidence 702 in addition to Federal Rule of Civil Procedure 26(a)(2) for the court to consider that expert's testimony as evidence in this case.

### 3. Admissible Evidence

Plaintiffs contend that the government "deliberately submitted inaccurate documents to this Court, that should have raised serious ethical and legal concerns."  ECF No. 144 at 11.  Plaintiffs claim that counsel for the government "knowingly attempt[ed] to deceive this court by offering false evidence, misstating facts, presenting and relying upon a [sic] false or deceptive affidavits/declarations, suppressing relevant information that should be disclosed, assisting in any fraud, crime, or illegal conduct."  Id.  These are bold accusations that speak to the question of admissibility of evidence.

It is elementary that, for evidence to be admissible, it must be relevant to an issue being tried.  See Fed. R. Evid. 402.  Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequent to the determination of the action more probable or less probable than it would be without the evidence."  See Fed. R. Evid. 401.  Authentication "represent[s] a special aspect of relevancy."  Fed. R. Evid. 901(a) advisory committee's note.  That is because evidence that is not which its proponent claims cannot make the existence of a disputed fact more or less likely.  United States v. Branch, 970 F.2d 1368, 1370 (4th Cir. 1992).  Consequently, the court must determine whether the proponent of evidence has "offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic" before admitting evidence for consideration by the factfinder.  See id. (citing Fed. R. Evid. 104(b) advisory committee's

note).  Then, "because authentication is essentially a question of conditional relevancy, the jury ultimately resolves whether evidence admitted for its consideration is that which the proponent claims."  Id. at 1370–71.  Once evidence has been shown to meet the low threshold of relevance, however, it is presumptively admissible unless the constitution, a statue, rule of evidence or procedure, or caselaw requires that it be excluded.  Fed. R. Evid. 402.  Thus, the function of all the rules of evidence other than Rule 401 is to help determine whether evidence which is relevant should nonetheless be excluded.[3]  Fed. R. Evid. 402 advisory committee's note.

In response to plaintiffs' claims as to the government's proffered evidence, the court notes that those claims speak to the authenticity of that evidence.  Rule 901 provides the standard for authenticating or identifying an item of evidence.  Fed. R. Evid. 901.  In contrast, Rule 902 establishes that there are items of evidence that are self-authenticating meaning that "they require no extrinsic evidence of authenticity in order to be admitted."  Fed. R. Evid. 902.  To be clear, Rules 901 and 902 apply to items of evidence, not to testimony from witnesses.  As detailed above, there are two types of witnesses: lay witnesses and expert witnesses.  Article VI of the Federal Rules of Evidence contains the rules which specify who may testify as a lay witness at trial.  See Fed. R. Evid. 601–15.  In contrast, Article VII governs expert testimony.  See Fed. R. Evid. 701–06.  At trial, both parties will be able to cross-examine each other's witnesses

---

[3] For example, Rule 403 allows the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

pursuant to Rule 611.  See Fed. R. Evid. 611 (Mode and Order of Examining Witnesses and Presenting Evidence).

Though the foregoing is not a comprehensive summary of the Federal Rules of Evidence, it is provided to explain that the parties have specific rules which govern what evidence is admissible at trial and what evidence the factfinder may consider in reaching its determination.  Simply because evidence is presented does not mean that it is relevant and admissible, and the court will determine the evidence's admissibility in accordance with the Federal Rules of Evidence.

Finally, "[a]lthough the pleadings of pro se litigants are construed liberally, there is no lower standard when it comes to rules of evidence and procedure."  Johnson v. Hendrick Auto. Grp., 2011 WL 6032706, at *3 (W.D.N.C. Dec. 5, 2011) (quoting In re Thomas, 2008 WL 112042, at *3 n.4 (W.D. Va. Jan. 9, 2008)), aff'd, 471 F. App'x 192 (4th Cir. 2012).  "[E]ven for pro se litigants, courts are not responsible for making basic evidentiary objections."  In re Pequeno, 126 F. App'x 158, 165 (5th Cir. 2005).  "While pro se litigants are afforded some latitude when it comes to technical procedural requirements, the Court expects them to follow the same rules of evidence and procedure as is required by those authorized to practice law."  El Bey v. Celebration Station, 2006 WL 2811497, at *2 (W.D.N.C. Sept. 28, 2006), aff'd, 242 F. App'x 917 (4th Cir. 2007). That includes requiring pro se plaintiffs to establish the authenticity of any document they put before the court.  Klabiner v. Rinaldi, 2001 WL 823529, at *6 (M.D.N.C. June 20, 2001), aff'd, 22 F. App'x 347 (4th Cir. 2002).  In sum, both the government and the plaintiffs in this case will be required to establish that the evidence and testimony they present at trial are relevant, authenticated, and admissible pursuant to the Federal Rules

of Evidence. Any concerns or objections that one party has in response to its party-opponent's submitted evidence may be made pursuant to the Federal Rules of Evidence at trial or in a motion in limine timely filed in accordance with the scheduling order.[4]

**B. Motion for Reconsideration**

The court finds it material to first summarize its conclusions from the Summary Judgment Order before turning to plaintiffs' motion for reconsideration of that order.

First, the court found that plaintiffs failed to produce persuasive evidence that Dr. Park and Dr. Kallingal fabricated medical records, and, consequently, found that plaintiffs failed to prove that either doctor acted outside the scope of their employment.[5] ECF No. 110 at 12–13. As a result, the court dismissed Drs. Kallingal and Park from the action and substituted the United States in their place. Id.

Second, the court granted summary judgment in the defendants' favor on plaintiffs' medical battery claim. Id. at 15. Under Texas law, medical battery "generally involves claims that a doctor performed acts on the patient without consent." Baribeau v. Gustafson, 107 S.W.3d 52, 61 (Tex. App. 2003)). The court found that plaintiffs offered no evidence that the consent form was forged. ECF No. 110 at 14. Moreover, the court

---

[4] "The purpose of a motion in limine is to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the jury will consider." In re Aqueous Film-Forming Foams Prods. Liab. Litig., 2023 WL 3521472, at *1 (D.S.C. May 12, 2023). The current scheduling order stipulates that motions in limine must be filed no later than June 1, 2024.

[5] Though the court later concludes in this order that there is a genuine issue of material fact as to whether Mr. Brown consented to the surgery, the court clarifies that there is no credible evidence on the record that Dr. Park or Dr. Kallingal intentionally fabricated the medical records. As such, the court does not grant the motion for reconsideration as to its previous decision on the motion for certification. See ECF No. 110 at 7–13. Consequently, the United States remains substituted as a party in place of Dr. Kallingal and Dr. Park.

found that (1) Mr. Brown and Mrs. Brown acknowledged in their depositions that they had signed a consent form; (2) Dr. Gillcrist stated that it was common practice for interns to perform the consent procedure and that her signature on the form indicates that she obtained Mr. Brown's consent; and (3) Dr. Kallingal would have never stated on the consent form that he would perform the robot assisted laparoscopic prostatectomy without assistance because the procedure cannot be done by one person alone. Id. Consequently, the court adopted the R&R and granted summary judgment on plaintiffs' medical battery claim. Id. at 15.

Third, the court denied summary judgment on plaintiffs' medical malpractice claims for Dr. Park's alleged failure to diagnose and treat Mr. Brown's anastomotic leak injury. Id. at 19. Under Texas law, a plaintiff asserting medical malpractice has the burden of proving: "(1) a duty by the physician or hospital to act according to an applicable standard of care; (2) a breach of that standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury." Quijano, 325 F.3d at 567 (citing Mills v. Angel, 995 S.W.2d 262, 267 (Tex. App. 1999)). A plaintiff is generally required to provide expert testimony to establish the elements of medical malpractice. Hood, 554 S.W.2d at 165–66. Expert testimony is particularly important when proving causation. See Garcia v. Palestine Mem'l Hosp., 2002 WL 192359, at *2 (Tex. App. Feb. 7, 2002). Plaintiffs provided expert testimony from Dr. Dudley Seth Danoff who reviewed Mr. Brown's medical records and his multiple hospital admissions after surgery to conclude Dr. Park failure to timely diagnose the ureterovesical anastomotic leak and that delay "proximately caused [Mr. Brown] to undergo additional treatment for two years." ECF No. 110 at 18 (citing ECF No. 61-3 at 4). The government provided

testimony of their own expert witness, Dr. Daniel Canter, who rebutted Dr. Danoff's testimony. Id. at 17. Thus, the court found that there was a genuine dispute of material fact as to which expert witness to credit such that the question is properly left to the jury. Id.

Fourth and finally, the court concluded that under Texas law, loss of consortium is an element of damages. Id. at 20 (citing Rodriguez v. Blaine Larsen Farms, Inc., 2022 WL 18034478, at *1 (N.D. Tex. Apr. 21, 2022)). Thus, Mrs. Brown's claim for loss of consortium survived summary judgment because Mr. Brown's claim for medical malpractice also survived summary judgment. Id.

Plaintiffs filed a wide-ranging motion for reconsideration pursuant to Rule 59(e). ECF No. 136. Liberally construed, plaintiffs seek reconsideration of the court's grant of summary judgment to the defendants on the medical battery claim. See id. at 8; Hughes, 449 U.S. at 9. In response, the government filed a brief to assert that Rule 60(b) governs the instant motion and that no grounds for relief under Rule 60(b) warrant the granting of the motion for reconsideration. ECF No. 140 at 4–9. The government then filed a supplement. ECF No. 143. That supplement notes that the government identified "two additional documents relating to the issue of Mr. Brown's informed consent" and indicates that counsel for the government called Mr. Brown to determine whether he had received those documents previously because plaintiffs had not served written discovery on the government during the discovery period. Id. at 1–2. The government then produced bates labeled copies of the medical records to the plaintiffs and submitted the supplement to the court. Id. at 2. In reply, plaintiffs filed a thirty-eight-page brief which reiterates some of the previously raised points and which argues that the government's

newly filed supplement, ECF No. 140-1, is new evidence that justifies granting their motion for reconsideration.  ECF No. 144 at 31–35.

The court filed the Summary Judgment Order on September 5, 2023.  ECF No. 110.  Plaintiffs filed the instant motion 169 days later, on February 21, 2024.  ECF No. 136.  Thus, plaintiffs filed the motion more than twenty-eight-days after the court filed its order, and the court must construe plaintiffs' motion as being brought pursuant to Rule 60(b).  See Robinson, 599 F.3d at 412; Wriglesworth, 765 F. App'x 6.

Federal Rule of Civil Procedure 60(b) states that, "the court may relieve a party or its legal representative from a final judgment, order, or proceeding for six reasons."  Fed. R. Civ. P. 60(b).  The plaintiffs bring their motion pursuant to the first, second, third, and sixth subsections of Rule 60(b).[6]  See ECF No. 140 at 5–6.  The court finds that the second subsection is material to this motion.  See Fed. R. Civ. P. 60(b)(2).  Accordingly, the court may relieve the plaintiffs from the order granting summary judgment on the medical battery claim for "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)."

In the Fourth Circuit, "the standard governing relief on the basis of newly discovered evidence is the same whether the motion is brought under [R]ule 59 or [R]ule

---

[6] Those relevant subsections state that the court may relieve a party or its legal representative from a final judgment, order, or proceeding for:

> (1) mistake, inadvertence, surprise, or excusable neglect;
> (2) newly discovered evidence that, with reasonable diligence, could not
>     have been discovered in time to move for a new trial under Rule 59(b);
> (3) fraud (whether previously called intrinsic or extrinsic),
>     misrepresentation, or misconduct by an opposing party;
> [. . .]
> (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

60." Henley v. FMC Corp., 20 F. App'x 108, 114–15 (4th Cir. 2001) (quoting Boryan v. United States, 884 F.2d 767, 771 (4th Cir. 1989)). Plaintiffs must demonstrate five elements for relief on the basis of newly discovered evidence:

> (1) the evidence is newly discovered since the judgment was entered; (2) due diligence on the part of the movant to discover the new evidence has been exercised; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that is likely to produce a new outcome if the case were retried, or is such that would require the judgment to be amended.

Boryan, 884 F.2d at 771 (quoting Taylor v. Texgas Corp., 831 F.2d 255, 259 (11th Cir. 1987)). "Thus, in order to support a motion for reconsideration, 'the movant is obliged to show not only that this evidence was newly discovered or unknown to it until after the hearing but also that it could not with reasonable diligence have discovered and produced such evidence at the hearing.'" Id. (quoting Frederick S. Wyle P.C. v. Texaco, Inc., 764 F.2d 604, 609 (9th Cir. 1985)).

### 1. Newly Discovered Evidence

The "new evidence" at issue are the additional documents relevant to Mr. Brown's consent—and therefore his medical battery claim—that the government filed with its supplement on March 7, 2024. ECF No. 143; see Boryan, 884 F.2d at 771. The court summarizes and describes those documents in turn. See ECF No. 143-1. First, the government provided a second declaration from Dr. Kallingal to explain and interpret the new medical records. Id. at 1–2 ("2d Kallingal Decl."). Second, the government produced a signed consent form for anesthesia that was signed on May 8, 2019, at 10:49:46 a.m., showing Mrs. Brown witnessed and signed it. Id. at 4. This document is not new, but it is relevant to consent, and the court will refer to it as the "Anesthesia Consent Form." See ECF Nos. 1-1 at 8; 61-4; 75-7. Third, the government produced a

signed consent form for the robotic-assisted laparoscopic prostatectomy ("RALP") procedure which Mr. Brown signed at 9:25:42 a.m. with Robert Messenger LVN witnessing the signature.  ECF No. 143-1 at 3.  This document also contains the signature of the Counseling Physician over the printed name "GEORGE JOSEPH KALLINGAL," but the signature is likely that of intern Nancy Gillcrist.  See id.  This form is also not new, but it is relevant to consent, and the court will refer to it as the "RALP Consent Form."  See ECF Nos. 1-1 at 9; 75-8.

The court now turns to the new documents.  First, the government produced a form labeled with the number 00801 which is titled "MEDICAL RECORD – UNIVERSAL PROTOCOL: PROCEDURE VERIFICATION CHECKLIST."  ECF No. 143-1 at 5 ("Procedure Verification Checklist").  This document has five signatures on it. See id.  Dr. Kallingal avers that his signature was the "Provider Signature" and that he verified Mr. Brown's informed consent to perform the RALP at 10:45 a.m.  2d Kallingal Decl. ¶ 7.  However, Mr. Brown points the court's attention to the first signature on the Procedure Verification Checklist where a clinical staff member signed to indicate that "consent [wa]s complete" at 9:20 a.m.  ECF No. 143-1 at 5.  Mr. Brown had not purportedly signed the RALP Consent Form until 9:25 a.m.  See ECF No. 143-1 at 3. Without additional context, it is unclear whether the other four signatures on the Procedure Verification Checklist independently verified Mr. Brown's consent to the surgery, or relied on that first 9:20 a.m. signature.

Second, the government produced a form labeled PAU/PREP & HOLD which is identified by the number 000804.  Id. at 6 ("Prep & Hold Form").  At the top of the page, under "Pre-Admission Unit" an unidentified person indicated that Mr. Brown had signed

his Anesthesia Consent but had not yet signed his Surgical Consent.  <u>Id.</u>  At the bottom of

that page, in the comments section, an unidentified person wrote "no surgical consent."

<u>Id.</u>  Dr. Kallingal explained that the Prep & Hold Form indicates that on May 9, 2019,

Mr. Brown was placed in BAMC's surgical prep and hold area at 8:45 a.m.  2d Kallingal

Decl. ¶ 5.  According to the document, when Mr. Brown got to the surgical prep and hold

area at 8:45 a.m., Mr. Brown had not yet signed his RALP Consent Form.  <u>See id.</u>; <u>see</u>

<u>also</u> ECF No. 143-1 at 6.  The form shows, however, that Mr. Brown had signed his

Anesthesia Consent Form the prior day.  2d Kallingal Decl. ¶ 5; <u>see also</u> ECF No. 143-1

at 6.  These two documents are new to the government, new to the plaintiffs, and new to

the court, were not filed with the motions for summary judgment, and were not

considered in the court's evaluation of the parties' arguments on those motions.  As such,

the Procedure Verification Checklist and the Prep & Hold Form constitute "new

evidence" under Rule 60(b).

### 2.  Plaintiffs' Reasonable Diligence

The plaintiffs exercised reasonable diligence in that they requested Mr. Brown's

entire medical record from BAMC prior to filing this case.  To be sure, it may be

debatable whether the <u>pro se</u> litigants exercised due diligence when they failed to serve

the government with any written discovery.  <u>See</u> ECF No. 143 at 1–2.  But the record

shows that plaintiffs attached Mr. Brown's medical record to the original complaint.  <u>See</u>

ECF No. 1-1.  They also attached it to support their motion for summary judgment.  ECF

Nos. 61-1; 61-2; 61-3; 61-4; 61-5; 61-6.  Plaintiffs have also incorporated evidence that

the defendants have produced to support their arguments.  <u>See, e.g.</u>, ECF No. 61-7.  Thus,

if the Procedure Verification Checklist and the Prep & Hold Form had been available to

the plaintiffs or included in the medical record, the plaintiffs could have relied upon those documents in making their arguments.  See ECF No. 144 at 31–35.

The government indicates that when its counsel reviewed Mr. Brown's medical records in preparation for trial in this case, it found two additional documents related to the issue of Mr. Brown's informed consent that had not previously been identified or produced.  ECF No. 143 at 1.  Counsel for the government called Mr. Brown to determine whether he had received the two identified documents directly from BAMC when he had requested and received his records from BAMC prior to filing the complaint in this case.  Id. at 1–2.  Mr. Brown indicated that he had not previously seen or received those documents, despite requesting his entire medical record from BAMC.  Id.  Mr. Brown emphasized as much at an in-person status conference before the court.  See ECF No. 147.  To ensure both parties have the same documents, counsel for the government "is producing to Plaintiffs bates labeled copies of the medical records that Defendant has obtained from BAMC as of the date of this filing."  ECF No. 143 at 2.

Plaintiffs are pro se litigants who believed that BAMC had produced Mr. Brown's entire medical record prior to filing this case.  See ECF No. 147; see also ECF No. 143 at 1–2.  Though plaintiffs certainly could have served written discovery on the defendants during the discovery period, their failure to request BAMC medical records from the defendants during discovery is excused, in part, by the fact that they believed BAMC had already produced that entire record to them.  As such, the court finds that plaintiffs

exercised due diligence in seeking the BAMC medical record.  Consequently, this second element is met.

### 3.  Material Evidence, which is not Cumulative or Impeaching, is Likely to Produce a New Outcome

The court examines the third, fourth, and fifth elements together, ultimately finding them met.  In providing this analysis, the undersigned finds it helpful to reiterate the required elements for medical battery as well as the evidence that was before the court on the motions for summary judgment alongside the newly produced Procedure Verification Checklist and the Prep & Hold Form.  To reiterate, in the Summary Judgment Order, the court viewed the evidence in the light most favorable to the plaintiffs and found no genuine issue of material fact, meaning, the evidence before the court was such that a reasonable jury could not return a verdict for the plaintiffs on the medical battery claim.  See Anderson, 477 U.S. at 248–49, 255; ECF No. 110 at 13–15.  Consequently, the court granted summary judgment to the government on that medical battery claim.  See ECF No. 110 at 15.

Under Texas law, "[m]edical treatment will not constitute a battery unless it is provided without the patient's consent."  Murphy v. Russell, 167 S.W.3d 835, 838 (Tex. 2005).  "[T]he general rule in Texas is that a physician who provides treatment without consent commits a battery."  Miller ex rel. Miller v. HCA, Inc., 118 S.W.3d 758, 767 (Tex. 2003).  Moreover, there is no medical battery if the primary surgeon does not disclose an assisting surgeon's level of participation or experience.  Benge v. Williams, 472 S.W.3d 684, 709 (Tex. App. 2014), aff'd, 548 S.W.3d 466 (Tex. 2018).  Texas courts have also held that a medical-battery plaintiff could not prevail under a theory that the

assisting surgeon was not his or her chosen surgeon where the plaintiff had consented to participation by other staff members, including residents.  Haynes v. Beceiro, 219 S.W.3d 24, 25 (Tex. App. 2006); Benge, 472 S.W.3d at 689–90.  Consequently, there were two factual questions presented in this case: (1) did Mr. Brown consent to (a) anesthesia and (b) the surgery; and (2) if Mr. Brown consented to Dr. Kallingal performing the surgery, did Dr. Kallingal in fact perform the surgery.  See R&R at 21–24; ECF No. 110 at 13–15.

The court adopted the magistrate judge's analysis of the latter question and found that, based on the evidence, there was no genuine issue of material fact as to whether Dr. Kallingal was the primary surgeon.  ECF No. 110 at 10.  The evidence in question was the following.  On the one hand, the government submitted the "Anesthesia Record" which lists Dr. Kallingal as the "Surgeon."  ECF No. 75-10.  The government also submitted Dr. Kallingal's affidavit testimony indicating that he was the console surgeon, Kallingal Decl. ¶ 25, and Dr. Park's affidavit testimony indicating that she provided bedside assistance by positioning, prepping, and draping the patient while Dr. Kallingal operated the robot, Park Decl. ¶ 13.  On the other hand, plaintiffs submitted a "Nurse Intraoperative Note" dated May 9, 2019, which lists Dr. Kallingal as the "Responsible Staff Surgeon" and Dr. Park as the "Primary Surgeon."  ECF No. 61-2 at 2.  Beyond the Anesthesia Record and the affidavit testimony, the government presented no evidence specifically documenting that Dr. Kallingal was the "console surgeon" for Mr. Brown's procedure.  R&R at 10.  The court adopted the R&R's ultimate recommendation to find that Dr. Kallingal performed the surgery.  ECF No. 110 at 10.  The new evidence does not change this analysis.  If in fact Mr. Brown consented to the surgery, there is no claim

for medical battery because there is no genuine dispute of material fact that Dr. Kallingal, not Dr. Park, performed the surgery.

The court now turns to the former question and first evaluates whether there is a genuine dispute of material fact as to whether Mr. Brown signed the Anesthesia Consent Form before considering whether a genuine dispute of material fact exists as to whether Mr. Brown signed the RALP Consent form.

There is no genuine dispute of material fact that Mr. Brown signed the Anesthesia Consent Form.  The new evidence only bolster's this court's previous conclusion as to the Anesthesia Consent Form, where the Prep & Hold Form confirms that Mr. Brown had signed the Anesthesia Consent Form prior to entering BAMC's surgical prep and hold area on the date of his surgery.  See ECF No. 143-1 at 6.  This confirms the previous evidence before the court.  Mr. Brown testified in his deposition that he came to the hospital on May 8, 2019, to sign the Anesthesia Consent Form.  ECF No. 75-1, Mr. Brown Depo. at 20:22–21:5.  Mrs. Brown also testified that she witnessed Mr. Brown sign the Anesthesia Consent Form on May 8, 2019.  ECF No. 75-2, Mrs. Brown Depo. at 25:2–18.  Thus, there is no genuine dispute of material fact as to whether Mr. Brown signed the Anesthesia Consent Form.

However, when the court considers the two new documents, it reaches the conclusion that there is a genuine dispute of material fact as to whether Mr. Brown signed the RALP Consent Form and, therefore, whether Mr. Brown consented to the surgery itself.  Mr. Brown testified to going back to Dr. Park's office and signing a consent form the day of the surgery on May 9, 2019.  Mr. Brown Depo. at 24:23–25:4.  Mrs. Brown also testified that she and Mr. Brown went back to Dr. Park's office that morning for Mr.

26

Brown to sign an electronic consent form.  Mrs. Brown Depo. at 35:9–37:12.  However, a review of the RALP Consent Form shows that it does not contain Dr. Park's signature. See ECF No. 143-1 at 3.  Dr. Park testified that the RALP Consent Form does not contain her signature but that the signature on the page might be that of Nancy Gillcrist.  Park Decl. ¶ 11.  The government provided a declaration from Nancy Gillcrist in which she reviewed the RALP Consent Form and recognized the signature as her own, though she did not recall the day, patient, or surgery.  ECF No. 75-9, Gillcrist Decl. ¶¶ 7–10. Despite the inconsistency over whether it was Dr. Gillcrist or Dr. Park who walked plaintiffs through informed consent, the court found on the motion for summary judgment that there was no genuine issue of material fact that Mr. Brown consented.

Yet that brings us to the two new documents which need to be placed in context with the other evidence before the court.  First, there is a discrepancy with the Prep & Hold Form and Mr. and Mrs. Brown's testimony as to consent.  The Prep & Hold Form indicates that when Mr. Brown was brought to the surgical prep and hold area—an area where it is unclear whether Mrs. Brown could accompany him—he had not yet signed the RALP Consent Form.  ECF No. 143-1 at 6.  Mrs. Brown and Mr. Brown both indicated that, on the morning of the surgery, Dr. Park took them back to her office and had Mr. Brown consent to surgery.  See Mr. Brown Depo. at 24:23–25:4; Mrs. Brown Depo. at 35:9–37:12.  Dr. Park testified that she did not witness Mr. Brown sign the RALP Consent Form that morning, because her signature is not on the form.  Park Decl. ¶ 11. Mrs. Brown testified that she was allowed to stay with Mr. Brown until he was rolled back for surgery—though it is unclear whether that was the surgical prep and hold area, or into surgery itself.  Mrs. Brown Depo. at 35:9–12.  The Prep & Hold Form indicates

that, when Mr. Brown was brought into the surgical prep and hold area at 8:45 a.m., he had not signed the RALP Consent Form. ECF No. 143-1 at 6; 2d Kallingal Decl. ¶ 6. Thus, taking the evidence in the light most favorable to the plaintiffs, the Prep & Hold Form creates an ambiguity in terms of who witnessed Mr. Brown's consent and whether the RALP Consent Form clearly shows his consent. Second, the Procedure Verification Form indicates that at 9:20 a.m., a clinical staff confirmed that Mr. Brown had signed the RALP Consent Form. ECF No. 143-1 at 5. However, the RALP Consent Form, itself, shows that Mr. Brown purportedly signed that form at 9:25:42 a.m., five minutes later. ECF No. 143-1 at 3. This too is a discrepancy. Finally, the court circles back to plaintiffs' contentions of forgery: that the RALP Consent Form does not have Mr. Brown's signature but that the signature on that form was forged as evidenced by the signature's purported deviation from Mr. Brown's standard signature. ECF Nos. 63 at 6; 63-2; 63-3; 63-4; 63-5.

The R&R recommended that this court find there is no evidence that the RALP Consent Form signature is not Mr. Brown's because of Mr. and Mrs. Brown's respective testimony that he signed a consent form with Dr. Park that morning and because of Dr. Gillcrist's declaration that her signature was on the RALP Consent Form, meaning that she probably sought their consent. R&R at 20. The R&R found plaintiffs' allegations of forgery to be unsupported and unverified. Id. at 19. In response to the R&R, plaintiffs requested to submit an expert report from Patricia Hale ("Hale"), a forensic document examiner and handwriting expert. See ECF Nos. 104 at 8; 104-3 at 4. Hale would purportedly testify that someone forged Mr. Brown's signature on the RALP Consent Form. ECF No. 104 at 7–8. The court denied plaintiffs' request that it consider Hale's

28

expert report because the request was untimely and because the report was unlikely to "move the needle." ECF No. 110 at 12. In reaching that conclusion, the court relied on the same evidence that the R&R relied on: Mr. and Mrs. Brown's testimony that Mr. Brown signed a consent form the day of the surgery and Dr. Gillcrist's declaration that she likely witnessed that signature. Id. at 12–13.

In the time since, plaintiffs filed a motion in limine requesting to name Hale and Mrs. Brown as expert witnesses. ECF No. 115. On February 29, 2024, the court granted the motion in limine and allowed plaintiffs to name Hale and Mrs. Brown as expert witnesses, provided they qualify as such in accordance with Fed. R. Civ. P. 26(a)(2) and Fed. R. Evid. 702, as detailed above. ECF No. 137. Liberally construed, plaintiffs originally filed their motion for reconsideration so that the court could review the order resolving the motions for summary judgment considering Hale's anticipated expert testimony. ECF No. 136 at 9, 11. Then, on March 7, 2024, the government identified two new documents and submitted them into evidence. ECF No. 143-1 at 5, 6. In reply, and liberally construed, plaintiffs again emphasize Hale's anticipated testimony and argue that the two new documents should change the court's outcome on the government's motion for summary judgment. ECF No. 144 at 14, 19–20, 31–35.

Altogether, the evidence before the court today is meaningfully different from the evidence before the court on the motions for summary judgment. Stated in terms of Rule 60(b), "(3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that is likely to produce a new outcome." Fed. R. Civ. P. 60(b). Considering the foregoing, the court notes that there is now a genuine dispute of material fact as to whether Mr. Brown signed the RALP Consent Form on May

9, 2019.  To reiterate, "the general rule in Texas is that a physician who provides treatment without consent commits a battery."  <u>Miller ex rel. Miller</u>, 118 S.W.3d at 767. When the court considers the evidence in the light most favorable to the plaintiffs— discrepancies in the hospital records as to when Mr. Brown consented, with whom he consented, and the evidence from Hale that the signature on the RALP Consent Form does not match Mr. Brown's signature—a reasonable jury could return a verdict for the plaintiffs on the medical battery claim.[7]  <u>See</u> <u>Anderson</u>, 477 U.S. at 255.  As such, the court grants plaintiffs' motion for reconsideration, ECF No. 136, and denies the government's motion for summary judgment as to medical battery because it is debatable whether Mr. Brown consented to the surgery with the RALP Consent Form on May 9, 2019.  <u>See</u> ECF No. 75.

## IV.   CONCLUSION

For the foregoing reasons, the court **GRANTS** plaintiffs' motion for reconsideration.  The court **REVISES** its order and **DENIES** summary judgment for the government on plaintiffs' medical battery claim as it relates to whether Mr. Brown consented to surgery.

---

[7] To be clear, the court is not finding for the plaintiffs on this claim.  Upon reconsideration, it denies both parties' motions for summary judgment as to the medical battery claim in addition to the medical malpractice claim and loss of consortium portion of damages.  <u>See</u> ECF Nos. 61; 75.  At trial, plaintiffs bear the burden of proof for their claims of medical battery, medical malpractice, and loss of consortium as an element of damages.

AND IT IS SO ORDERED.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 25, 2024**
**Charleston, South Carolina**